**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| PHYSICIANS HEALTHSOURCE, INC., an Ohio corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | No. 1:12-cv-00729-RJJ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| STRYKER SALES CORPORATION, STRYKER BIOTECH L.L.C., STRYKER CORPORATION, HOWMEDICA OSTEONICS CORP., and JOHN DOES 1-10, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**BRIAN J. WANCA**
Anderson + Wanca
*Attorney for Plaintiff*
3701 Algonquin Road, Suite 760
Rolling Meadows, IL 60008
Telephone: 847-368-1500
Facsimile: 847-368-1501
bwanca@andersonwanca.com

# TABLE OF CONTENTS

TABLE OF POINTS AND AUTHORITIES .................................................................. iii

CONCISE STATEMENT OF THE ISSUES PRESENTED ................................................. 1

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNCONTESTED FACTS ................................................................. 2

    A.    STRYKER MARKETS ITS PRODUCTS DIRECTLY TO DOCTORS AT SEMINARS HOSTED BY AND PAID FOR BY STRYKER THAT DISCUSS THE AVAILABILITY OF STRYKER MEDICAL DEVICES .......................... 2

    B.  STRYKER PROMOTED ITS PCP SEMINARS BY FACSIMILE ......................... 6

    C.  STRYKER SENT 15,041 FAXES TI 8,065 UNIQUE FAX NUMBERS ............... 7

STANDARDS FOR SUMMARY JUDGMENT ................................................................ 7

ARGUMENT ........................................................................................................... 8

    I.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT .............................. 8

        A.    THE FACSIMILES SENT TO PLAINTIFF AND THE CLASS WERE ADVERTISEMENTS ............................................................. 8

        B.    THE FAX AT ISSUE WAS SENT WITHOUT PERMISSION AND WITHOUT A PROPER OPT-OUT; ACCORDINGLY AN EBR AND/OR CONSENT DEFENSE IS UNAVAILABLE AS A MATTER OF LAW ............................................................. 14

        C.    THE CLASS IS ENTITLED TO $500 IN LIQUIDATED STATUTORY DAMAGES PER VIOLATION WHICH SHOULD BE TREBLED BASED ON DEFENDANTS' WILLFUL CONDUCT ................. 16

i

CONCLUSION ....................................................................................................17

CERTIFICATE OF SERVICE ...............................................................................18

# TABLE OF POINTS AND AUTHORITIES

**CASES**                                                                  **Page(s)**

*A Aventura Chiropractic v. Med Waste Mgmt., LLC,* No. 12-21695-CIV
    (S.D. Fla. July 3, 2013) ............................................................................16

*Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768 (11th Cir. 2011) .......................1

*All Am. Painting, LLC v. Fin. Solutions & Assocs.*, 315 S.W.3d 719 (Mo. 2010) ..............1

*Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.,*
    2013 WL 3654550 (W.D. Mich. July 12, 2013).......................................................2

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .......................................................7

*Bais Yaakov of Spring Valley v. Alloy, Inc.,* 936 F. Supp 2d 272 (S.D.N.Y. 2013) ........16

*DirectTV, Inc. v. Boonstra,* 302 F. sup. 2d 822 (W.D. Mich. 2004) .................................7

*EEOC v. City of Janespille,* 630 F. 2d 1254 (7th Cir. 1980) .............................................14

*Gibson & Co. Ins. Brokers, Inc. v. Jackson Nat'l Life Ins. Co.,* No. CV 06-5342 DSF
    (C.D. Cal. Oct. 30, 2006) ........................................................................13

*Green v. Time Ins. Co.,* 629 F. Supp. 2d 834 (N.D. Ill. 2009) .........................................13

*Harjoe v. Colonial Life & Accident Ins. Co.*, No. 02 CC-1986
    (Mo. Cir. Ct. Aug. 29, 2002)..................................................................13

*HogarAguay Vida en el Desierto, Inc. V. Suare-Medina,*
    36 F.3d 177 (1st Cir. 1994).....................................................................14

*Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682 (7th Cir. 2013) .................................15, 16

*Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. 1162 (S.D. Ind. 1997).................................14

*Mims v. Arrow Financial Services, LLC,* 132 S. Ct. 740 (2012) .......................................9

*Nack v. Walburg,* 715 F.3d 680 (8th Cir. May 21, 2013) ..........................................15, 16

*Penzer v. Transp. Ins. Co.*, 545 F.3d 1303 (11th Cir. 2008)....................................1

*Sachs v. Ohio Nat. Life Ins.,* 131 F.2d 134 (7th Cir. 1942) ...............................14

*Sadowski v. OCO Biomedical Inc.,* 2008 WL 5082992 (N.D. Ill. Nov. 25, 2008)...........12

*Scarborough v. Atlantic Coast Line, 178 F.2d 253 (4th Cir. 1950)* ....................14

*Schreiber v. Phillips Display Components Co.*, 580 F.3d 355 (6th Cir. 2009)....................8

*Schumacher Fin. Servs., Inc. v. Steckelberg,*
    No. 03 AC-8706 Y CV (Mo. Cir. Ct., Oct. 14, 2003) ..........................................13

*\*Senegenberger v. Credit Control Services, Inc.,* 2010 WL 1791270
    (N.D. Ill. May 5, 2010) .......................................................16

*\*Stonecrafters, Inc.v. Almo Distributing New York, Inc.,* No. 07 C 5105
    (N.D. Ill. July 23, 2008) .......................................................12

*Texas v. American Blast Fax, Inc.*, 121 F. Supp. 2d 1085 (W.D. Tex. 2000) ..................14

*\*Thomas M. Cooley Law School v. Kurzon Straus, LLP,* 2013 WL 5603256
    (W.D. Mich. Sept. 30, 2013)...................................................7

*Vandervort v. Balboa Capital Corp.,* 287 F.R.D. 554 (C.D. Cal. 2012) ..........................16

## STATUTES and RULES

Fed. R. Civ. P. 56(a)………………………………………………………….…1

Fed. R. Civ. P. 56(c) …………………………………………………………….…7

47 U.S.C. §227 (a)(2)(D) ………………………………………………….…2, 8, 14

47 U.S.C. §227 (a)(5) …………………………………………………………….…8

*47 U.S.C. §227 (b)(1)(C) …………………………………………………….1, 2, 8, 14

47 U.S.C. §227 (b)(2) …………………………………………………………….…9

47 U.S.C. §227 (b)(2)(E) ................................................................15

47 U.S.C. §227 (b)(3) .................................................................1, 16

47 U.S.C. §227 (b)(3)(A) - (B) ....................................................1, 16

47 U.S.C. §227 (b)(2)(D) ..............................................................2, 8

47 U.S.C. §312 (f)(1) .....................................................................16

*47 C.F.R. §64.1200(a)(3)(iii) – (iv) ........................................2, 8, 14

*47 C.F.R. §64.1200(a)(4)(iii) – (iv).............................................15

47 C.F.R. §64.1200(f)(1) ..................................................................9

*Rules and Regulations Implementing the Telephone Consumer Protection
    *Act of 1991,* 18 FCC Red. 14014 (2003) ........................................9

*In re Rules and Regulations Implementing the Telephone Consumer Protection
    *Act of 1991,* 71 Fed. Reg. 25967-01 (May 3, 2006) ...........................15

*Rules and Regulations Implementing the Telephone Consumer Protection
    *Act of 1991,* 21 FCC Red. 3787 (2006) ...........................................9

## *THE CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT

## <u>CONCISE STATEMENT OF THE ISSUES PRESENTED</u>

1.  Whether the faxes at issue are advertisements under the Telephone Consumer Protection Act of 1991 ("TCPA") and its implementing regulations.

2.  Whether the Defendants violated the TCPA by sending fax advertisements without an opt-out notice.

3.  Whether Defendants' actions were willful or knowing and, if so, whether the Court should treble statutory damages.

Plaintiff, Physicians HealthSource, Inc. ("Plaintiff"), individually and as the representative of a certified class of similarly-situated persons (the "Class"), submits this Memorandum of Law in Support of its Motion for Summary Judgment as to its TCPA Claim, pursuant to Federal Rule of Civil Procedure 56(a), against Defendants Stryker Sales Corporation, Stryker Biotech L.L.C., Stryker Corporation (collectively "Stryker" or "Defendants").

## <u>INTRODUCTION</u>

The Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(C), forbids the use of "any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine." The TCPA creates a private right of action for any person or entity that receives an advertisement in violation of the act and regulations, and provides for statutory damages in the amount of $500 for each violation as well as injunctive relief against future violations. 47 U.S.C. § 227(b)(3)(A)-(B); *All Am. Painting, LLC v. Fin. Solutions & Assocs.*, 315 S.W.3d 719, 722 (Mo. 2010). Additionally, the TCPA provides that treble damages may be assessed if in the court's discretion the defendant willfully or knowingly violated the act. 47 U.S.C. § 227(b)(3); *All Am. Painting*, 315 S.W.3d at 722-23. "[T]he TCPA is essentially a strict liability statute" that imposes liability upon senders of unsolicited faxes. *Alea London Ltd. v. Am. Home Servs., Inc.* 638 F.3d 768, 776 (11th Cir. 2011) (citing *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008)). "[T]he statute does not require any intent on the part of the sender for liability, except when

1

awarding treble damages." *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 2013 WL 3654550 (W.D. Mich. July 12, 2013) (granting summary judgment for plaintiff in TCPA fax action).

Stryker produces medical equipment and devices, which Stryker markets through seminars to promote their products to other medical professionals. In particular, Stryker seeks the attendance of primary care physicians ("PCPs") at these seminars so that they may be informed by speakers contracted by Stryker of, among other things, products offered by Stryker. It is undisputed that Stryker promoted these seminars by fax, sending 15,041 faxes to 8,065 unique fax numbers between December 3, 2009 and August 8, 2011, and that <u>none</u> had the requisite opt-out notice required by the TCPA and its implementing regulations. *See* 47 U.S.C. § 227(b)(1)(C); *Id.* § 227(a)(2)(D); 47 C.F.R. § 64.1200(a)(3)(iii) and (iv).

The Class now seeks recovery for violation of the TCPA.[1] The uncontested facts demonstrate conclusively that Defendants have violated the TCPA – the faxes at issue are "advertisements" as defined under the TCPA, the faxes do not contain opt-out notices as required by the TCPA, thereby precluding Defendants as a matter of law from arguing the faxes were sent pursuant to an existing business relationship ("EBR") or with consent, and finally, Defendants conduct in violating the TCPA was willful, thereby entitling Plaintiff and the Class to trebling of the $500 in liquidated statutory damages to $1,500 per violation.

## PLAINTIFF'S STATEMENT OF UNCONTESTED FACTS[2]

**A. Stryker Markets Its Products Directly To Doctors At Seminars Hosted By And Paid For By Stryker That Discuss The Availability Of Stryker Medical Devices.**

---

[1] On December 11, 2013, the Court granted Plaintiff's motion for class certification, and approved Plaintiff as the representative of a Class defined as: "All persons who: (1) on or after four years prior to the filing of this action, (2) were subscribers of a fax number that received, (3) a fax invitation to attend a presentation for primary care physicians on advancements in orthopaedics, arthritis, joint replacement, or joint replacement options, (4) received from one or more of Defendants, and (5) that did not display a proper opt-out notice. (Doc. No. 88, Page ID 2360).

[2] Copies of the Exhibits cited herein are attached to Plaintiff's Appendix of Exhibits.

Defendants, Stryker Sales Corporation ("Sales"), Stryker Biotech L.L.C. ("Biotech"), Stryker Corporation ("Stryker"), Howmedica Osteonics Corp. ("Howmedica"), (collectively "Stryker" or "Defendants") produce a broad array of medical equipment and devices, including "implants used in joint replacement, trauma, spinal and craniomaxillo facial surgeries; surgical equipment and surgical navigation systems, endoscopic and communications systems; patient handling and emergency medical equipment as well as other medical device products used in a variety of medical specialties." (Stryker 2009 10-K Report, <u>Exhibit N</u>, at 1; Stryker 2010 10-K Report, <u>Exhibit O</u>, at 1; Stryker 2011 10-K Report, <u>Exhibit P</u>, at 1).

Stryker markets most of its products directly to doctors, hospitals and other healthcare facilities through "dedicated sales forces" for each of its principal product lines. (Stryker 2009 10-K Report, <u>Exhibit N</u>, at 10; Stryker 2010 10-K Report, <u>Exhibit O</u>, at 9; Stryker 2011 10-K Report, <u>Exhibit P</u>, at 1). Stryker regularly hosted "Primary Care Physician Seminars," specifically targeting the attendance of primary care physicians ("PCPs") at the seminars so they may be informed by speakers contracted by Stryker of technological advancements in orthopedic implant devices, including products offered by Stryker. (Quigley Decl., <u>Exhibit M</u>, at ¶¶5-9).

An orthopedic surgeon intending to speak at a PCP seminar was required to sign Stryker's Sponsored Primary Care Physician Seminar Agreement ("PCP Agreement"). (Quigley Decl., <u>Exhibit M</u>, at ¶22). The PCP Agreement states that the PCP seminars are "an excellent way to provide physicians with valuable, educational information and <u>raise awareness of orthopaedic treatment options offered by Stryker</u>." (PCP Agreement, <u>Exhibit A</u>). The PCP Agreement states that the speaker "will make use only of presentation materials provided by Stryker, and will not alter or supplement those materials." (PCP Agreement, <u>Exhibit A</u>, at ¶1(a)). The "materials" provided by Stryker consisted of, *inter alia*, Powerpoint slides. (Quigley Decl., Exhibit M, at ¶26). The PCP Agreement also required speakers to limit their remarks to on-label uses. (PCP Agreement, <u>Exhibit</u>

A; at ¶1(b); Quigley Decl., Exhibit M, at ¶24).

The PowerPoint slides discussed orthopedic treatment options and new technologies, such as coatings and bearings. (Quigley Decl., Exhibit M, at ¶24). Stryker has stated that "[t]hese seminars informed PCPs (such as family doctors, internists and ob/gyns about recent developments in orthopedic treatment, including developments in the design of implantable medical devices." (Defs.' Br., Dkt. No. 69, at 3; Quigley Decl., Exhibit M, at ¶¶6-9). Stryker "paid expenses associated with announcing and hosting its seminars, including costs for the contact information, food, and handout materials." (Quigley Decl., Exhibit M, at ¶33). The majority of speakers were Stryker-associated physicians and are themselves listed on Stryker's own website. (Stryker Physicians, Exhibit I).

The PowerPoint slides repeatedly mention Stryker and Stryker products. (Stryker PowerPoint Slides Group III, Exhibit L, 1-59). For example, the PowerPoint slides contain direct references to Stryker products:

- Ceramic-on-Ceramic Hip Replacement, wherein the PowerPoint slide states: "additional" or "more" information about ceramic hip replacement is available to you: Call 1-888-Stryker or visit www.aboutstryker.com," or www.strykerceramics.com  (Stryker PowerPoint Slides Group I, Exhibit J, at 2-6).

- Stryker's "EIUS" and its "Triathlon" Knee Implant System, stating as to the Triathlon Knee System that it has an "advanced implant design for greater implant longevity," it is designed for natural knee movement," it was "designed with women in mind," and it is a "better fit for women." (Stryker PowerPoint Slides Group I, Exhibit J, at 7-9, 15-18).

- Stryker's "Implant Technology," including the "Accolade TMZF," which is described as a "MIS-friendly implant," which is "compatible with ceramic-on-ceramic technology for long-term results," and the "Trident Acetabular Implant Options," described as a "ceramic-on-ceramic" option for active patients which can "optimize long-term results."  (Stryker PowerPoint Slides Group I, Exhibit J, at 10-14).

- Stryker's "Navigation," described as a "visual enabler for MIS Surgery facilitating more accurate placement of prosthesis" and that implant alignment "is an important factor that

4

may reduce joint wear and tear and extend the life of the implant" and, in the next slide, Stryker describes how its "Navigation" system works. (Stryker PowerPoint Slides Group I, Exhibit J, at 20-21).

- Stryker's "Anatomic Hip Implants," stating that "Stryker's Anatomic Femoral Heads are larger in size, similar to the top of the femur" and that they are "anatomically sized for natural-like hip performance." (Stryker PowerPoint Slides Group I, Exhibit J, at 22).

- Stryker's "X3 Technology," which Stryker states decreases hip wear, comparing Stryker's "highly crosslinked" product to a "standard" product, and which Stryker states decreases knee wear, noting that "X3 has demonstrated 96% decrease in wear compared to competitive premium bearing technologies," and comparing "Competitve Premium Bearing Technologies" with the Stryker "Triathlon X3." (Stryker PowerPoint Slides Group I, Exhibit J, at 23-24).

The PowerPoint slides also contain the following:

- "The information presented in this presentation is intended to demonstrate a Stryker product. Always refer to the package insert, product label and/or user instructions before using any Stryker product. Surgeons must always rely on their own clinical judgment when deciding which treatments and procedures to use with patients. Products may not available in all markets. Product availability is subject to regulatory or medical practices that govern individual markets." (Stryker PowerPoint Slides Group II, Exhibit K, at 1-4) (emphasis added).

- a "Patient Testimonial" with the name "Stryker" prominently displayed on the slide with an individual described as having a "Stryker Shoulder Replacement, 2004." (Stryker PowerPoint Slides Group I, Exhibit J, at 19).

- a statement that: "All seminars must address only the FDA labeled indications for Stryker products. Stryker recommends using all product slides as-is to stay within FDA labeling guidelines." (Stryker PowerPoint Slides Group II, Exhibit K, at 6, 8).

Stephanie Groh ("Groh") is employed by Stryker Orthopaedics as program director whose duties include setting up PCP seminars. (Groh Dep. Tr., Exhibit H, at 6, 7, 10-12). Groh testified that one of the purposes of the PCP seminars was to provide information to PCPs about Stryker

artificial knees and hips that could be used to treat arthritis and to make PCPs aware of products offered by Stryker Orthopaedics for treatment of joint pain or osteoarthritis affecting knees and hips. (Groh Dep. Tr., Exhibit H, at 40, 44, 48, 49). Groh further testified that she has never used any orthopedic surgeon as a speaker at a PCP seminar who did not use Stryker products because speakers who use Stryker products are "going to understand the clinical features of the Stryker products." (Groh Dep. Tr., Exhibit H, at 49).

**B.      Stryker Promoted Its PCP Seminars By Facsimile.**

Stryker promoted the PCP seminars by fax. (Faxes, Exhibit F). In order to promote the PCP seminars by facsimile, Stryker purchased lists of fax numbers from a list provider company called Redi-Mail Direct Marketing, Inc. ("RediMail"). (Serapione Dep. Tr., Exhibit B, at 27-33, 42). Breda Bramich ("Bramich"), a consultant for Stryker, would contact RediMail to obtain a list of fax numbers. (Serapione Dep. Tr., Exhibit B, at 27). Bramich would promote the seminars by either specialty or by geography. (Serapione Dep. Tr., Exhibit B, at 27). Stryker began using MudBug Media, Inc. ("MudBug") in December 2009 to create the content of the faxes to promote the seminars. (Bramich Dep. Tr., Exhibit E, at 49-51). MudBug contracted with third-party fax broadcaster Actual Software, Inc. d/b/a Broadcast-Fax ("Actual Software") to send the faxes. (Haffner Dep. Tr., Exhibit X, at 70-73).

The faxes all contain the name "Stryker." (Faxes, Exhibit F, at 1-128). The Faxes invite PCPs to seminars discussing "advancements" in: joint replacement, orthopaedics (including computer assisted surgery), hip and knee replacement (including computer assisted surgery), hip resurfacing, foot and ankle treatment options, hip and knee treatment options, hand treatment options, total knee arthroplasty, joint replacement (including "the next generation of joint replacements for a new generation of patients"). (Faxes, Exhibit F, at 1-128). Two of the Faxes invite recipients to a seminar wherein Johnny Bench, who is described as a paid spokesperson for Stryker, will discuss his own hip

replacement experience. (Faxes, Exhibit F, at 52-53). Of the 128 faxes, 112 of them had a picture of one of Stryker's implantable devices. (Faxes, Exhibit F).

Prior to December 2009, Stryker sent the faxes using Fax2Mail, a desktop faxing software. (Stryker Ans to Interrog. No. 4, Exhibit C). An example of a Stryker junk fax sent by the Fax2Mail software is attached hereto as Exhibit D.[3] Typically, the junk faxes sent by the Fax2Mail system were all four pages. (Bramich Dep. Tr., Exhibit E, at 71).

### C. Stryker Sent 15,041 Faxes To 8,065 Unique Fax Numbers.

Plaintiff's unrebutted expert witness, Robert Biggerstaff ("Biggerstaff") reviewed the documents produced, including the transmission reports produced by Actual Software. Transmission records are electronic records showing that faxes are sent and received. Biggerstaff concluded that Stryker sent 15,041 faxes to 8,065 unique fax numbers. (Biggerstaff Report, Exhibit G, at ¶16). None of the faxes have an opt-out notice. (Faxes, Exhibit F, at 1-128).

<u>**STANDARDS FOR SUMMARY JUDGMENT**</u>

Summary Judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are facts which are defined by substantive law and are necessary to apply the law. *DirectTV, Inc. v. Boonstra*, 302 F. Supp. 2d 822, 826-27 (W.D. Mich. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party must "inform the district court of the basis for its motion," and it must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Thomas M. Cooley Law School v. Kurzon Straus, LLP*, 2013 WL 5603256,

---

[3]     This is the copy of the four-page fax received by Plaintiff on October 12, 2009.

at *4 (W.D. Mich. Sept. 30, 2013) (quoting *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009). "In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party." *Id.*

## ARGUMENT

## I.     PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT.

To prevail under the TCPA, Plaintiff must show (1) the faxes were "advertisements," (2) the faxes lacked the opt-out notice required by the TCPA and implementing regulations, and (3) that Defendants used "a telephone facsimile machine, computer or other device" to send the faxes. 47 U.S.C. § 227(b)(1)(C); *Id.* § 227(a)(2)(D); 47 C.F.R. § 64.1200(a)(3)(iii) and (iv).

As demonstrated below, the faxes at issue were part of Stryker's overall marketing campaign and served as a pretext to advertise its implantable medical devices. Accordingly, the faxes are advertisements under the TCPA. Moreover, without an opt-out notice, Defendants EBR and consent defenses fail as a matter of law. It is also undisputed that Stryker sent the 15,041 faxes to 8,065 unique fax numbers using a telephone facsimile machine, computer, or other device. (Biggerstaff Report, Exhibit G, at ¶16). Finally, Plaintiff is entitled to treble damages, as Defendants' fax blasting campaign easily satisfies the requisite willfulness necessary for trebling.

### A.     The Facsimiles Sent To Plaintiff And The Class Were Advertisements.

The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." 47 U.S.C. § 227(a)(5). The Federal Communication Commission (FCC) regulations implementing the TCPA clarify, "[t]he term advertisement means any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1).[4] The regulations also provide that "[o]ffers for free

---

[4] The FCC has the authority to prescribe regulations to implement the TCPA. 47 U.S.C. § 227(b)(2); *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 744 (2012) (the Act directs the FCC to prescribe implementing

goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute 'advertising the commercial availability or quality of any property, goods, or services.'" *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd. 14014 at ¶ 140 (2003). More directly on point, the FCC has concluded "facsimile messages that promote goods or services even at no cost, such as . . . free consultations or seminars are unsolicited advertisements under the TCPA's definition. In many instances, "free" seminars serve as a **pretext to advertise commercial products and services**. By contrast, only those facsimile communications that **contain only** information, such as industry news articles, legislative updates, or employee benefit information, would not be prohibited by the TCPA rules." *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 FCC Rcd 3787 at ¶ 52 (2006) (emphasis added).

Here, Stryker cannot escape the uncontested facts that conclusively demonstrate the faxes that announced the seminars (and free dinners) are a pretext for Stryker to market its medical products and implantable devices. This evidence starts with the PCP Agreement, wherein Stryker states the PCP seminars are "an excellent way to provide physicians with valuable, educational information and <u>raise awareness of orthopaedic treatment options offered by Stryker</u>." (PCP Agreement, <u>Exhibit A)</u>. Of course, the "treatment options" offered by Stryker are its implantable devices. Moreover, the PCP Agreement states the speaker "will make use only of presentation materials provided by Stryker, and will not alter or supplement those materials." (PCP Agreement, <u>Exhibit A</u>, at ¶1(a)). Those "materials" are Stryker's Powerpoint slides, which are loaded with direct references to Stryker's wide array of implantable medical devices. (Quigley Decl., Exhibit M, at ¶26). The PCP Agreement further requires speakers to limit their remarks to on-label uses. (PCP

---

regulations).

Agreement, Exhibit A; at ¶1(b); Quigley Decl., Exhibit M, at ¶24). As Plaintiff's expert, Charles B. Oppenheim stated:

> Under applicable Food and Drug Administration ("FDA") regulations, medical devices are approved and labeled for specific uses (referred to as "on-label" usage). Physicans, of course, most commonly use FDA-approved medical devices for their approved purposes. However, physicians are also permitted to use approved medical devices for non-approved purposes (referred to as "off-label" usage). Although physicians are permitted to exercise their medical judgment to make off-label use of medical devices, the applicable FDA regulations prohibit medical device companies from ***promoting*** off-label uses.
>
> The fact that Stryker sees the need to require physician presenters, in the Seminar Agreement, to agree they will not discuss off-label uses, is tantamount to an admission that the presentation is to promote Stryker products, *i.e.*, it is a sales pitch. Stryker compels presenters not to discuss off-label usage because applicable regulations governing the manner in which Stryker may promote its devices limit these types of presentations to the promotion of "on-label" usage.

(Oppenheim Report, Exhibit U, at 3, 4) (emphasis in original) (footnote omitted).

Stryker has also admitted that "[t]hese seminars informed PCPs (such as family doctors, internists and ob/gyns) about recent developments in orthopedic treatment, including developments in the design of implantable medical devices." (Defs.' Br., Dkt. No. 69, at 3; Quigley Decl., Exhibit M, at ¶¶6-9). Stryker cannot pretend the purpose of these meetings was not to discuss *Stryker's* "implantable medical devices" and inform its PCP of the availability of these implantable devices. One of Stryker's employees whose job it is to set up PCP seminars (Stephanie Groh) testified that one of the purposes of the PCP seminars was to provide information to PCPs about Stryker's artificial knees and hips that could be used to treat arthritis and to make PCPs aware of products offered by Stryker Orthopaedics for treatment of joint pain or osteoarthritis affecting knees and hips. (Groh Dep. Tr., Exhibit H, at 40, 44, 48, 49).

Moreover, and underscoring the fact that the faxes announcing the PCP seminars are a pretext to advertise Stryker implantable medical devices and products, Groh testified she has never used any orthopedic surgeon as a speaker at a PCP seminar who did not use Stryker products

because speakers who use Stryker products are "going to understand the clinical features of the Stryker products." (Groh Dep. Tr., <u>Exhibit H</u>, at 49). Not surprisingly, Stryker "paid expenses associated with announcing and hosting its seminars, including costs for the contact information, food, and handout materials." (Quigley Decl., <u>Exhibit M</u>, at ¶33).

The text of the various PCP seminar PowerPoint slides are definitive regarding the fact that the seminars were a marketing platform for Stryker's medical devices. As set forth above, the PowerPoint slides are saturated with references to Stryker and its medical devices:

- Stryker's "Ceramic-on-Ceramic Hip Replacement" (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 2-6)

- Stryker's "EIUS" and its "Triathlon" Knee Implant System (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 7-9, 15-18).

- Stryker's "Implant Technology," including the "Accolade TMZF," and the "Trident Acetabular Implant Options" (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 10-14).

- Stryker's "Navigatio" system, "visual enabler for MIS Surgery facilitating more accurate placement of prosthesis (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 20-21).

- Stryker's "Anatomic Hip Implants" (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 22).

- Stryker's "X3 Technology" (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 23-24).

In fact, as to which Stryker's "X3 Technology," Stryker's PowerPoint slide compares Stryker products to other products or systems in the market place, stating the X3 Technology decreases hip wear, comparing Stryker's "highly crosslinked" product to a "standard" product. (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 23). Stryker also compares its X3 technology to the market place regarding knee replacement, stating that the "X3 has demonstrated 96% decrease in wear compared to competitive premium bearing technologies," comparing "Competitive Premium Bearing Technologies" with the "Triathlon X3." (Stryker PowerPoint Slides Group I, <u>Exhibit J</u>, at 24).

Stryker also expressly admits in the PowerPoint slides that "the information presented in this presentation is intended to demonstrate a Stryker product, that "products may not available in all markets," and that "product availability is subject to regulatory or medical practices that govern individual markets." (Stryker PowerPoint Slides Group II, <u>Exhibit K</u>, at 1-4). Such unequivocal admissions foreclose any genuine claim that the PCP seminars are not intended to market Stryker's products and that the faxes announcing the seminars are not a pretext. Oppenheim describes Stryker's marketing plan succinctly:

> Stryker and its affiliates want to tell primary care physicians about Stryker products with the hope and expectation that the primary physicians will refer more patients, sooner, to orthopedic surgeons, and potentially so that the primary care physicians will tell their patients what these primary care physicians have heard about Stryker devices, and the primary care physicians and/or their patients will, in turn, ask/tell the orthopedic surgeons about Stryker products. All these activities and conversations, in turn, are intended to have the effect of increasing the likelihood that these primary care physicians' patients will ultimately receive a Stryker implantable medical device.

(Oppenheim Report, <u>Exhibit U</u>, at 3).

Courts routinely hold that a fax announcing a seminar is an advertisement for purposes of a TCPA claim. In *Stonecrafters, Inc. v. Almo Distributing New York, Inc.,* No. 07 C 5105 (N.D. Ill. July 23, 2008) (Exhibit Q), the fax at issue concerned a free training session. Although in the context of denying a motion to dismiss, the court's reasoning is instructive: "[b]y sending out this fax, it is evident that defendant hoped to either attract potential customers or, if nothing else, to promote the quality of those products at the training session." The court further noted an advertisement for purposes of the TCPA is not limited to a direct sale of any specific product as "such overt advertising techniques are not required to maintain a cause of action under the TCPA." *Id.*; *see also Sadowski v. OCO Biomedical, Inc.,* 2008 WL 5082992, at *2 (N.D. Ill. Nov. 25, 2008) (argument that fax was merely an invitation does "not pass the straight-face test. The fax clearly promoted a training seminar, which is a service . . . . The fax also advertises the availability of the goods that [defendant]

sells.").

Nor must there be an explicit offer to sell, as long as the fax notifies someone of the commercial availability of property, goods or services. *See, e.g., Gibson & Co. Ins. Brokers, Inc. v. Jackson Nat'l Life Ins. Co.,* No. CV 06-5342 DSF, at 4-5 (C.D. Cal. Oct. 30, 2006) (Exhibit T) (faxes "prominently bear Defendant's corporate name and Defendant is a for profit business. It is reasonable to assume that it offered the seminars with the aim of increasing profits, even if indirectly . . . . [N]othing in the statutory language indicates that there must be an explicit offer to sell. Further, there is no indication that in order to be 'commercial,' an activity must be exclusively directed toward generating profits . . . . [It is] reasonable to assume that the seminars necessarily must have been designed, in part . . . to generate potential new business."); *Schumacher Fin. Servs., Inc. v. Steckelberg,* No. 03 AC-8706 Y CV, at *5 (Mo. Cir. Ct., Oct. 14, 2003) (opinion attached hereto as Exhibit R) (to be an advertisement under the TCPA, a fax "need only make known to, or notify, someone about the commercial availability of any property, goods or services").

In *Harjoe v. Colonial Life & Accident Ins. Co.,* No. 02 CC-1983, at p.3 (Mo. Cir. Ct. Aug. 29, 2002) (Exhibit S), the court noted, "Defendant argues that nothing is being offered 'for sale' by the faxes." *Id.* at *3. "But there is no requirement that to be covered by the statute, that the goods or services advertised actually must be for sale to the recipient." *Id.* "They only have to be 'advertised.'" *Id.* "Defendant is clearly engaged in a commercial insurance business, <u>and the fax in question does notify the recipient about the existence of Defendant's insurance wares and their commercial availability</u>." *Id.* at *3-*4 (emphasis added).

Finally, in *Green v. Time Ins. Co.,* 629 F. Supp. 2d 834, 837 (N.D. Ill. 2009), the court found that the fax at issue was "clearly" an "unsolicited advertisement" in that it advertised the availability and quality of Time Insurance's products and service. The court rejected the argument that the fax was not an advertisement but an invitation to establish a business relationship, stating that "the

13

TCPA does not require an overt sales pitch to the recipient for a cause of action to exist." *Id.*

In sum, the PCP seminars are an advertising campaign to advertise and market Stryker's products. The faxes at issue (which this Court has observed are "substantially similar and in some cases nearly identical"), promote the presentations dated between December 4, 2009 to August 10, 2011, are part of that same advertising campaign and are thus advertisements under the TCPA. (*See* Doc. No. 88, Page ID 2356; Faxes, Exhibit F, at 1-128).[5]

**B.     The Faxes At Issue Were Sent Without A Proper Opt-Out; Accordingly An EBR And Consent Defense Are Unavailable As A Matter Of Law.**

Defendants have asserted affirmative defenses of EBR and consent. (*See* Doc. No. 56, Page ID 681 (Eighth Affirmative Defense) and Page ID 682 (Fifteenth Affirmative Defense). In order to maintain those defenses, the TCPA requires three elements: (1) the sender has an EBR with the recipient; (2) the sender obtained the recipient's fax number either through a voluntary communication between the two or through a public source on which the recipient voluntarily made the number available; and (3) the fax has an opt-out notice meeting the requirements of the statute. 47 U.S.C. § 227(b)(1)(C). The opt-out-notice requirement, 47 U.S.C. § 227(b)(2)(D), directs the FCC to "prescribe regulations to implement" the requirement.

The corresponding FCC regulation requires that an opt-out notice must:

(1)     Be clear and conspicuous and on the first page of the advertisement;

(2)     State that the recipient may make a request to the sender not to send any future unsolicited advertisements and that failure to comply within 30 days is

---

[5] Because the TCPA is a remedial statute, the Court should broadly, not narrowly, construe the TCPA's definition of "advertisement." *See, e.g., Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. 1162, 1167 (S.D. Ind. 1997); *Texas v. Am. Blast Fax, Inc.,* 121 F. Supp. 2d 1085, 1091 (W.D. Tex. 2000). "Remedial statutes should be liberally construed and interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers." *Scarborough v. Atl. Coast Line,* 178 F.2d 253, 258 (4th Cir. 1950); *see also Sachs v. Ohio Nat. Life Ins.,* 131 F.2d 134, 137 (7th Cir. 1942) ("remedial statutes should be liberally construed, so as to prevent destruction of the purpose of the legislation"). Exemptions from remedial statutes "are to be construed narrowly to limit exemption eligibility." *HogarAguay Vida en el Desierto, Inc. v. Suare-Medina,* 36 F.3d 177, 182 (1st Cir. 1994); *see also EEOC v. City of Janesville,* 630 F.2d 1254, 1258 (7th Cir. 1980) ("an exemption to a remedial statute must be narrowly construed").

> unlawful;

> (3) Set forth the requirements for a request under 47 U.S.C. § 227(b)(2)(E); [6]

> (4) Include a domestic contact telephone and facsimile number for the recipient, and a cost-free mechanism for a recipient to transmit a request; and

> (5) Permit the recipient to make such a request at any time on any day of the week.

47 C.F.R. § 64.1200(a)(4)(iii). The regulation states, "[a] facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section." 47 C.F.R. § 64.1200(a)(4)(iv). The FCC has reiterated that the opt-out notice is required for all fax advertisements, even if there is an EBR or the sender has obtained prior consent. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967-01, 25972, 2006 WL 1151584 (May 3, 2006) ("In addition, entities that send facsimile advertisements to consumers from whom they obtained permission must include on the advertisements their opt-out notice and contact information to allow consumers to stop unwanted faxes in the future.").

The courts have deferred to the FCC on the subject, holding that if a fax does not strictly comply with opt-out requirement, the defendant cannot raise an EBR or consent defense. *See, e.g.*, *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013) ("Turza's faxes did not contain opt-out information, so if they are properly understood as advertising then they violate the Act whether or not the recipients were among Turza's clients."); *Nack v. Walburg*, 715 F.3d 680, 685 (8th Cir. May 21, 2013) (EBR and consent are not a defense where faxes contained improper opt-out language); *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 285–87 (S.D.N.Y. 2013) (same); *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554 (C.D. Cal. 2012) (same); *A Aventura Chiropractic v.*

---

[6] 47 U.S.C. § 227(b)(2)(E) states that a request not to send future unsolicited advertisements will be binding only if (1) it identifies the telephone number or numbers of the telephone facsimile machine to which the request relates; (2) the request is made to the telephone or facsimile number of the sender; and (3) the person making the request has not "subsequent to such request" provided express invitation or permission to the sender.

*Med Waste Mgmt., LLC*, No. 12-21695-CIV, 2013 WL 3463489, at *4 (S.D. Fla. July 3, 2013) (same).

Here, there is no opt-out language whatsoever. Because the fax does not comply with the opt-out requirement, Defendants cannot raise a defense of EBR or consent. *See Turza*, 728 F.3d at 683; *Nack*, 715 F.3d at 685; *Bais Yaakov of Spring Valley*, 2013 WL 1285408, at *11-12 ("[T]he FCC has expressly stated that 'the plain language of 47 C.F.R. § 64.1200(a)(3)(iv) requires facsimile advertisements sent with the recipients consent to contain an opt-out notice.'"); *Vandervort*, 287 F.R.D. at 557 ("The regulation is thus also unambiguous: *solicited* advertisements require opt-out notices, as well."); *A Aventura Chiropractic*, 2013 WL 3463489, at *4.

### C. The Class Is Entitled to $500 In Liquidated Statutory Damages Per Violation, Which Should Be Trebled Based On Defendants' Willful Conduct.

The TCPA creates a private cause of "action to ... receive $500 in damages for each such violation." 47 U.S.C. § 227(b)(3)(B). The Class, therefore, seeks and is entitled to summary judgment in the amount of $500 in liquidated statutory damages for each of the 15,041 times Defendants successfully sent an "unsolicited facsimile advertisement" to one of the Class members' "facsimile machines" in violation of the TCPA. 47 U.S.C. § 227(b)(3)(B).

The Court may treble the damages award if it finds that the Defendants' violations were committed "willfully or knowingly." 47 U.S.C. § 227 (b)(3) ("the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph"). The Communications Act of 1943—of which the TCPA is a part—defines the term "willful" as "the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision[ ], rule or regulation." 47 U.S.C. § 312(f) (1). *See Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270, *6 (N.D. Ill. May 5, 2010) (citation omitted).

Here, Plaintiff and the Class are entitled to treble damages. This case is not about a single fax advertisement or even a single fax blast. Instead, this is a case where Defendants bought a list of fax

numbers and sent 15,041 faxes to 8,065 separate fax numbers to market their products. The sheer volume denotes willfulness. Moreover, the purchasing of lists and the hiring of third parties to design and send the faxes, alone and when considered with the volume of faxes, clearly establishes willfulness under the TCPA and is precisely the type of fax blasting campaign that treble damages in the TCPA was meant to address. Consequently, the Court should find that Defendants' faxes were sent "willfully or knowingly" and treble the statutory damages to $1,500 per fax.

## CONCLUSION

Plaintiff respectfully requests that the Court enter summary judgment in favor of Plaintiff and the Class as to the TCPA claim and that the Court treble the statutory liquidated damages provision in the TCPA from $500 per violation to $1,500 per violation.

Respectfully submitted,


s/Brian J. Wanca

Brian J. Wanca
Ryan M. Kelly
ANDERSON + WANCA
3701 Algonquin Road, Suite 760
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501

## CERTIFICATE OF SERVICE

I certify that on January 10, 2014, I electronically filed the forgoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

/s/Brian J. Wanca

Brian J. Wanca